UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Docket No. 07-10725 |
| L.I.D., LTD. | New York, New York |
| Debtor. | July 31, 2007 |

TRANSCRIPT OF CHAPTER 11 - CASH COLLATERAL
BEFORE THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

A P P E A R A N C E S :

| For the Debtor: | **ROCHELLE R. WEISBURG, ESQ.**<br>Shiboleth, Yisraeli, Roberts et al |
|---|---|
| For the Debtor: | **AVRUM J. ROSEN, ESQ.**<br>Law Offices of Avrum J. Rosen |
| For the creditor,<br>Bank Leumi: | **FREDERICK E. SCHMIDT, ESQ.**<br>Herrick, Feinstein LLP |
| For the Creditor, HSBC: | **HENRY G. SWERGOLD, ESQ.**<br>**SCOTT K. LEVIN, ESQ.**<br>Platzer, Swergold, Karlin, et al |
| For the Creditor,<br>ABN AMRO Bank: | **LAURA METZGER, ESQ.**<br>**JEAN-MARIE L. ATAMIAN, ESQ.**<br>**CRAIG E. REIMER, ESQ.**<br>**RANIERO D'AVERSA, JR., ESQ.**<br>Mayer, Brown, Rowe & Maw, LLP |
| For the Creditor<br>Sovereign Bank: | **DAVID H. FLYNN, ESQ.**<br>Sovereign Bank |
| For the Landlords,<br>Michael and Frank Ring: | **ETHAN R. HOLTZ, ESQ.**<br>Morrison Cohen, LLP |
| | **ESTHER DUVAL, CPA**<br>Corporate Recovery Services |
| | **BRIAN MASUMOTO** |
| Transcriber: | AAA Electronic Sound Reporters<br>(888) 886-5135; (800) 860-5722 fax |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

INDEX

WITNESSES                DIRECT  CROSS  REDIRECT    RECROSS

No witnesses




EXHIBITS   DESCRIPTION                     MARKED   RECEIVED

No documents

1          THE COURT:  Be seated, please.

2          MR. ROSEN:  Thank you, Your Honor.

3          THE COURT:  It looks like everybody is here on one

4    case.  Why don't we start with the summary judgment motion --

5    not the summary judgment, the motion for stay relief, which

6    presumably can eliminate the need for some people to stay a very

7    long time.  That seems to be a separate and identified issue.

8          MR. ROSEN:  That's what I was going to suggest, Your

9    Honor; it makes more sense.  Counsel's motion.

10          THE COURT:  And I've read the motion and I've read the

11    response and I've read the reply.

12          MR. HOLTZ:  Thank you, Your Honor.  Ethan Holtz,

13    Morrison Cohen for the Landlord, F. and M. Ring.  Your Honor, we

14    believe this is a very simple motion.  The Debtor in 2006, LID,

15    brought an action in the State Court, the State Supreme Court,

16    the State of New York, against my client for breaches of the

17    lease, their commercial lease.

18          After my client answered the Complaint, my client

19    became aware of certain breaches of the lease committed by LID.

20    They sent notice of those breaches I believe about ten days

21    after their answer to the Complaint was filed.  Discovery

22    proceeded and in June of this year, about two months ago, my

23    client was able to confirm these breaches of the lease.

24          THE COURT:  What are the breaches that you're talking

25    about?

1    MR. HOLTZ:  They're actually -- well, two sets of

2  breaches.  The original breaches which occurred in late 2006

3  involved the legal construction that was performed on the

4  tenant's space without the landlord's consent, prior approval,

5  and submission of plans to the building department, or obtaining

6  permits to do so.  It was also discovered that the tenant, LID,

7  was without the landlord's consent subletting part their

8  premises to a subtenant.  This was confirmed in June, discovery

9  closed in the state court action a week later.

10    And then just two weeks ago on July 17, my client was

11  conducting a fire drill in the building and discovered

12  additional breaches committed by LID.  While going through their

13  space, they had discovered that there were additional subtenants

14  that they were previously unaware of and there was even more

15  unauthorized construction done in the space, specifically that

16  the tenant had partitioned the space in such a manner that the

17  fire alarms are no longer audible in most portions or certain

18  portions of the space which is a serious violation of the New

19  York City Fire Code.  So, the relief we're asking of this Court

20  is to modify the automatic stay to allow our client to ask the

21  state court for permission to amend its answer and assert

22  counterclaims.

23    Now, it's clear to us from the Debtor's response that

24  they would like to try to present to this Court the issue of

25  whether or not my client's counterclaims are appropriate heard

1    by the state court here.  That's not what we're asking for.  We

2    are simply asking for this Court to allow us to put the question

3    as to whether those counterclaims may be properly brought to the

4    state court.

5              THE COURT:  I understand what the alleged construction

6    and subletting issues are.  What are the counterclaims that you

7    seek to bring?

8              MR. HOLTZ:  For breach of the lease based on those

9    issues.  There are specific provisions of the lease which

10   prohibited the tenant from performing any construction on the

11   space without prior written approval, without the submission of

12   plans, without obtaining permits from the City; all of which

13   were not done.

14             THE COURT:  So, are you seeking by virtue of these

15   proposed counterclaims, damages or are you seeking a

16   determination that the lease has been terminated as a result of

17   these impermissible -- I'm using that term in quotation marks --

18   acts under the lease?

19             MR. HOLTZ:  It is my client's intention to seek

20   damages.

21             THE COURT:  But not to seek to terminate the lease?

22             MR. HOLTZ:  No.

23             THE COURT:  And in seeking damages, have you

24   quantified the damages that you're seeking and is it by way of

25   offset or is by way of affirmative relief?

1          MR. HOLTZ:  We believe -- we have yet to put a final

2    number on it; we seek to determine that at trial.  But we

3    believe it will most likely be an offset.

4          THE COURT:  All right.  I understand your position;

5    I'll hear from Rosen.

6          MR. HOLTZ:  Thank you, Your Honor.

7          MR. ROSEN:  Good morning, Your Honor; Avrum Rosen for

8    the Debtor.  Your Honor, part of my problem with the motion is

9    of course none of that information that you just solicited was

10   in the motion so I had no ability to deal with it.

11         THE COURT:  Well, now you know it.

12         MR. ROSEN:  Now, I know it and I'll attempt to deal

13   with it on the spot.  One of the more interesting things that

14   came out which contradicts what was in the motion is when they

15   found out about.  They're now alleging that they knew about when

16   they answered the complaint.  To the extent that they thought

17   they had any independent cause of action against the Debtor for

18   damages, Your Honor, the bar date is passed.  They had notice,

19   they've been in, and they never filed any proof of claim in this

20   matter.  I assume that's why the Court was asking the issue

21   about offset.  Clearly we would be opposed to any attempt to

22   have any kind of independent cause of action for damages.

23          The other issue that arises, Your Honor; they were not

24   able to quantify the issue as to whether or not -- from

25   everything I hear there, unless they put something before the

1   Court and it's their burden on proving cause, to lift the stay,

2   to show that they would have some claim to monetary damages even

3   on offset.  This is a non-monetary default.

4           And under the recent amendments, not so recent

5   anymore, but the amendments to 365 as a non-monetary default,

6   they don't necessarily have to be cured.  At the time of cure if

7   they can be monetized, they're monetized.  If they're not

8   curable, clearly -- and as an aside, Your Honor, to the extent

9   there's any violation issued on it, health and safety issue on a

10  post-petition basis, as soon as we have notice of what it is and

11  it's the first I've heard of that, we will of course take care

12  of that.  But I'll do that as a separate issue.

13          THE COURT:  Who's principally responsible for

14  litigating this in the state court on behalf of LID?

15          MR. ROSEN:  The firm who's -- Eaton & Van Winkle, Your

16  Honor.

17          THE COURT:  Is anybody from that firm here today?

18          MR. ROSEN:  No, Your Honor.

19          THE COURT:  I assumed that I can ask you a question

20  and you'll just do the best you can about that litigation.

21          MR. ROSEN:  I try -- I always do.

22          THE COURT:  I know that I have seen something about

23  the litigation in state court involving the Rings.  My question

24  to you is the thrust of that litigation from the Debtor's

25  perspective?  Are damages being sought, and if so what are those

1  damages?

2        MR. ROSEN:  I can actually answer that question, Your

3  Honor.  Not with great specificity but with enough to probably

4  guide you.  That was an action, Your Honor, in which while they

5  may have alleged some breach and they say they had knowledge of

6  it, no counterclaims have been interposed by the landlord.  That

7  is an action commenced by the Debtor for breaches of the

8  landlord in providing services to the Debtor.  There has never

9  been a monetary breach under the lease.  We have always paid our

10  rent.  And what has happened there is that --

11        THE COURT:  But it's an action by the Debtor for

12  damages.

13        MR. ROSEN:  Against the landlord.  And which to date,

14  Your Honor, despite raising some breach which they acknowledge

15  in their complaint, they never asserted a counterclaim

16  previously.  Now, after the bar date and after everything else

17  and now when we're in the final negotiations as to whether or

18  not we're going to stay or we're going to go, they're asserting

19  to -- they're attempting to now make a motion for permission to

20  amend their complaint to add a counterclaim.

21        THE COURT:  I'm going to let them do that.  I'm going

22  to let them do the best that they can to convince some state

23  court judge that they should be entitled to assert a

24  counterclaim.

25        Now, what happens with respect to that counterclaim is

1    something that may ultimately be before me again.  But I'm going

2    to grant the limited stay relief which has been requested which

3    is, as I understand it, the right to seek leave in the state

4    court litigation brought by LID against the landlord to assert

5    certain counterclaims which have been characterized here by

6    counsel, but which I'm assuming have not yet been drafted.  The

7    Debtor will have a full opportunity to raise issues at the time

8    that this is presented to the state court judge as to whether or

9    not it should be permissible at this stage of that litigation to

10   assert counterclaims and can confuse perhaps the state court

11   judge by raising a whole bunch of bankruptcy related issues

12   saying that it really should be barred because the bar date has

13   expired here.  If the state court wishes to deal with that

14   issue, they can try.

15        To the extent that the counterclaim is seeking to

16   actually collect damages from the Debtor, the stay relief which

17   I'm granting will not extend to that and there'll be a need to

18   come back here to obtain further relief, in which case I'll have

19   an independent opportunity to review the Sonnex (phonetic)

20   factors at that time.

21        I'm making no judgment now as to the nature of the

22   counterclaims being asserted and how it fits into the causes of

23   action that are being pled by the Debtor against the landlord,

24   but I'm going to at least allow the litigation which has been

25   actively pursued as I understand it by the Debtor to proceed and

1  to include such allegations as the landlord is able to

2  articulate to the satisfaction of the state court.

3       MR. ROSEN:  Your Honor, one point of clarification.

4  You said that they cannot go forward to attempt to collect.  My

5  understanding is that these -- as I raised in the papers --

6  would be rights of recoupment.  They seem to be separate from

7  what we're going after.  Do they have a right of offset or do

8  they have to come back to you?

9       THE COURT:  To the extent that there is to be a right

10  of offset or recoupment, anything that affects the economic

11  outcome of the Debtor's claims there'll be a need to come here

12  for ultimate approval of that right.  To the extent that the

13  state court litigation is settled, there'll be a need to come

14  here for an ultimate approval of that settlement.

15       MR. ROSEN:  Understood, Your Honor.  Thank you very

16  much.  Can I ask that the other side settle an order?

17       THE COURT:  You can submit an order.

18       MR. HOLTZ:  Thank you.

19       MR. ROSEN:  Thank you, Your Honor.

20       THE COURT:  Are there any other relatively small items

21  like that, that we can address or is everything else major?

22       MR. ROSEN:  No, there was one more, Your Honor, and

23  that is what you just brought up which is the application to

24  retain Eaton & Van Winkle.  This is one of these matters where

25  we originally -- we became obviously this litigation wasn't the

1  first issue on our minds when we filed.  We had the big fight

2  over cash collaterally.  Then thereafter when professionals were

3  being retained, I circulated a retention application to all the

4  lenders who were active on this.  It took a couple of weeks;

5  everyone approved it.  We sent it in.  Somehow it's gotten lost

6  in transit three times.  I mean my first transmittal letter not

7  to the Court, to the U.S. Trustee or between here and the U.S.

8  Trustee.

9       THE COURT:  But what's the status as of now?

10      MR. ROSEN:  So, the status as of right now is we

11  submitted it a couple of times; it's never been approved.  So, I

12  noticed it up for today.  I haven't received any objections.

13  It's a nunc pro tunc retention and --

14      THE COURT:  I'm prepared to approve it.  I simply want

15  the form of order to be signed by the U.S. Trustee's Office in

16  the objection line.

17      MR. ROSEN:  I understand, Your Honor.  As I said,

18  they've been doing the work; they're about to do summary

19  judgment motions.  I've sent it in three times.  I don't know.

20  The U.S. Trustee isn't here today; I thought he would be, so

21  we --

22      THE COURT:  Well, at the end of the day maybe you

23  could walk it over there and have the order approved by the U.S.

24  Trustee's Office before I enter it.  It's standard practice for

25  header attention to be subject to some oversight from the U.S.

1    Trustee's Office and maybe the three strike rules should apply

2    here, but I'm going to give them one more opportunity to take a

3    look at the form of order and to sign off on it.

4              MR. ROSEN:  Will do, Your Honor.

5              THE COURT:  Okay.

6              MR. ROSEN:  Thank you.  That's all the easy stuff.

7              THE COURT:  Okay.  Let's go to the hard stuff.

8              MR. ROSEN:  How would you like -- Your Honor, I'm not

9    quite sure how would you like to proceed.  You've been given a

10   lot of paper between Friday and today.

11             THE COURT:  Well, I've looked at least the briefs, and

12   I've looked at some of the notebooks as well.  My view of the

13   notebooks and I say this both with respect to the papers filed

14   jointly by the lenders and the papers that I received yesterday

15   afternoon from the Debtor; is that to the extent that there are

16   binders that include reports, exhibits, emails, settlement

17   proposals, and all manner of information, some of which may not

18   preferably admissible evidence, I've tried not to be influenced

19   by it and I've mostly skimmed over it rather than pay close

20   attention to it because I don't think that I should be

21   influenced by material that should not ordinarily be part of the

22   record.  Mr. Masumoto has just walked in and to the extent that

23   he's here with respect to the retention application that we just

24   talked about, I should alert him to the fact that I was prepared

25   to approve special litigation counsel nunc pro tunc provided

1    that the form of order is acceptable to the Office of the U.S.

2    Trustee and there's a no objection line signed by someone from

3    that office.  To the extent that Mr. Masumoto is here for other

4    reasons, particularly the cash collateral hearing, he's of

5    course welcome to stay the day.

6          MR. MASUMOTO:  Thank you, Your Honor; I was -- I'm

7    sorry for my delay.  I had some administrative matters to

8    handle.  I was here for the retention application.  We have no

9    objection to that retention.

10          THE COURT:  Fine.  The retention application is

11   approved and you can actually hand the form of order to Mr.

12   Masumoto so he can sign off on it right now.  And if he wishes

13   to stay he's always welcomed.

14          MR. MASUMOTO:  Thank you, Your Honor.

15          MR. ROSEN:  If only everything were that easy, Your

16   Honor.

17          THE COURT:  Well, as far as the materials that I

18   received on contested cash collateral, I'm generally familiar

19   with the positions that have been articulated both by the Debtor

20   and by the Lenders.  But I'm endeavoring not to be influenced by

21   material that's not in the record.

22          So, I'm familiar with it, but that's about it.  I know

23   for example that your Exhibit 14 is a settlement proposal that

24   was made on July 27.  I looked at it, but I didn't study it.  I

25   know for example that there are a number of deposition

1   transcripts of various people who are your witnesses in this

2   case.  I have not read them at all.  I don't consider that to be

3   something that I should be reading before an evidentiary

4   hearing.  And I'm generally familiar with the petitions of the

5   parties.  Now, how you wish to proceed, I leave to you.

6          MR. ROSEN:  Well, Your Honor, I think probably what we

7   should do is -- the most important issue to the Debtor is

8   probably the cash collateral.  I'm going to tell you how I view

9   it and probably let other people hear on how we should proceed

10  and that probably should be what we do before we actually do

11  proceed.

12         I think that clearly we've made a couple of motions in

13  limine to deal with the expert reports and to deal with the

14  other issues.  I think we need some kind of guidance or

15  resolution of those because I think that -- and also as to the

16  relevance because I think that defines the scope of the hearing.

17  If all of those people are going to testify, knowing how the

18  depositions went, knowing how what went on, I don't see us

19  finishing today; maybe I'm right; maybe I'm wrong on that.

20         We also need to exclusivity.  Some of those issues

21  dovetail in with the cash collateral.  Normally they wouldn't

22  necessarily, but I think because of some of the allegations that

23  are made by the lenders, those two may come.  So, I don't know

24  if you want to address them separately or together.  So, I think

25  probably for purposes of the clarity, at least the argument

1    should be separate on those.  I don't know if the Court needs an

2    evidentiary hearing on that or if it's got a better idea or if

3    it wants to put it off.  So, those are my general thoughts.  I

4    know other people want to be heard.

5          THE COURT:  Well, what I'd to -- let's do the

6    following.  I think that it would be useful to have some opening

7    remarks with respect to the most important motion that's before

8    me today, which is the continuing use of cash collateral.  The

9    motions in limine I view as tangential to that because it goes

10   to the scope of the hearing and that evidence which I can

11   properly consider.  And I'm prepared to consider that sometime

12   after the opening remarks, or if you wish to make it part of

13   your opening remarks, you can do that as well.

14         What I note and it's apparent from reading the papers

15   filed by the lenders and the papers that have been submitted by

16   LID there is a dispute regarding adequate protection; there is a

17   disagreement regarding the value of the collateral; and there is

18   the very open issue as to whether -- even though no motion has

19   been filed for a trustee, and even though no formal request has

20   been made for a chief restructuring officer -- whether Debtor's

21   management needs to be replaced or supplemented and as I read

22   the papers that have been filed by the lenders, even though they

23   haven't said we'll consent to cash collateral if a CRO is

24   appointed acceptable to us, I read their papers as saying that.

25         And to the extent that we're going to get into

1    evidentiary issues and Dalbert-type hearings as a preliminary to

2    the taking of evidence; particularly evidence that's being

3    offered by the lenders in defense of their position.  I agree

4    with you, we're not going to finish today because we're probably

5    going to spend a good part of the day arguing the Dalbert

6    issues.  I don't consider that a particularly efficient use of

7    time.  So, I'll hear what you have to say but the most efficient

8    use of time what seems to me would be for the parties to spend a

9    little bit of time talking to each other about whether there's

10   the ability to work out some kind of consensual resolution of

11   this.

12          If the marshalling of documents and lawyers and

13   witnesses evident in today's hearing is an indication that those

14   efforts have failed and that there's no point to further

15   talking, we can just proceed.  But it really seems to me from

16   what I've read that consensus should be possible if the Debtor

17   is willing to engage a CRO.  What I see is that the Debtor is

18   not willing to engage a CRO, but is talking in terms of CEO to

19   be retained sometime in the future.  This case isn't going to go

20   very well if the Debtor can't work something out acceptable to

21   its lenders.  Nor is it going to go very well if the lenders are

22   acting unreasonably.  I've made no judgment as to whether

23   anybody is acting unreasonably at this point.  So, why don't you

24   proceed with your opening?

25          MR. ROSEN:  Well, Your Honor, to answer your first

1   question, I for one think it always makes sense to talk.  And

2   despite the somewhat -- I think that probably the one thing that

3   everybody would agree, despite the somewhat strident tone in

4   everyone's papers because everyone was getting ready for war, I

5   think the negotiations by and large have been congenial and I

6   don't think between the professionals or anything there is

7   anyone stonewalled.

8         As you can tell by the intricacy of all the interim

9   cash collateral orders there's been a tremendous amount of give

10  and take and the crafting of solutions to try to come up with

11  each problem that has come along, all right.  But I would think

12  probably openings and then perhaps a chance for everyone to talk

13  would be a good idea because that makes sense.

14        Your Honor, you largely you understand I think from

15  what you just said the issues that are here.  This Debtor, as we

16  set forth in the papers, terms of the use of cash collateral,

17  has to an extraordinary extent opened its doors to investigation

18  by the Lenders.  My position in the beginning of this case was

19  that there was a lot of distrust, there was a lot of animosity.

20  There had been almost a year of negotiations before this case

21  was filed.  The Lenders decided for whatever reasons they did

22  and which we won't litigate today to pull the plug and to force

23  this Debtor into Chapter 11 when they called a default and then

24  had Bank Leumi seize its accounts.  Since that point, and this

25  goes a little bit, as I said, towards the hearing on exclusively

1    also, from the very beginning, the position was we can't talk

2    until there's disclosure.  We don't know what's there; we don't

3    know what's going on; we want to get in there, so I literally

4    opened the doors.

5         They've had, as we've put forth in our papers whether

6    they're admissible or not, they've had four or five different

7    experts in there.  Mr. Rosenthal was to be in there until May 4.

8    I let him stay until the end of June.  We commissioned -- you

9    know they commissioned the Hilco Report.  And if you read all of

10   those reports, which I know you haven't read for content, but if

11   you look at all of them, they all say that they've gotten

12   basically nothing but full cooperation from the Debtor.

13        There were some problems over when people wanted to

14   come back in and redo things because as you may imagine, this

15   puts a tremendous strain on the operations of the Debtor.

16   Basically the CFO was dealing with their professions on a daily

17   basis, plus trying to run the business.

18        During this time also, you know an inventory that

19   would normally take two weeks, took six weeks and basically shut

20   the Debtor down because it couldn't do anything while the

21   inventory was going on.  The position that the Debtor took and

22   has always taken is that back -- the big dispute has been, as

23   Your Honor correctly points out and the two major issues in the

24   cash collateral order has been are the Lenders going to let the

25   Debtor operate it's business in a normal course, which means for

1  this Debtor once it got out of selling to the majors and once it

2  got out of large program trading, being able to retool its stale

3  diamond jury by shipping it to its plant in India and having it

4  remanufactured and then selling it.

5         There are disputes over the inventory, but as I think

6  our analysis in the papers show on a best case -- even on a

7  worst case scenario if you apply the proper standard, these

8  Lenders are adequately protected without even getting into the

9  AR, without even getting into anything else.  I mean their first

10 appraisal gave them a liquidation value, which we have

11 maintained not the right standard, of about 39 million dollars

12 so they decided not to use that one because when you put the AR

13 in they were adequately protected.  So, they went out and got

14 another one that gave them a liquidation value a few weeks later

15 from a less qualified appraiser of half that amount.

16         They insisted at the beginning that we do an

17 inventory.  They insisted that they had to be massive amounts of

18 -- that items were missing in this.  You can see from what's

19 admitted in their reports even though we don't have the actual

20 inventory expert ever submitting a report just a spread sheet

21 which I got at about finally 7:30 or 8:30 last night, was

22 finally provided to me.  So, we have had no ability to test it

23 showing that everything was there.  We may have disputes over

24 value, but everything was there.  All of the jewelry was there,

25 but for three pieces out of 30 million dollars worth of

1   inventory it was all there.  And all of the diamonds were there

2   except for disputes over less than half of percent -- half of

3   one percent on the count of the diamond jewel out of a more than

4   30 million dollars worth of loose diamonds.  Pretty good numbers

5   for a company that the Lenders are saying doesn't know what its

6   doing, doesn't know how to manage its business.

7           So, the issues have become as we said before that are

8   they adequately protected.  And as I said I think they've tried

9   to play a game by coming in and trying to get to the right

10  number, which will give them the cushion so that they could come

11  in for their interests and come in for their fees, that they

12  will not be facing the issue that they've done a lot of

13  unnecessary litigation because they had a huge cushion, and that

14  they could come in and try and force the Debtor into giving

15  concessions by not letting the Debtor send it's inventory back

16  to India.

17          If you will see from the earlier proposals that are in

18  there that went on back in 2006 when they called a -- they

19  didn't actually call a default, but when they basically said we

20  will call a default if you don't stop shipping to India.  The

21  Debtor has been sitting with at least 20 million dollars worth

22  of inventory that he can't sell, that he can't re-tool because

23  the Lenders won't let it.

24          Their own report said that this new merchandise is

25  marketable and saleable and I think we've laid out a compelling

1   case and they have given you no case law on what standard you

2   should be using for valuation; not a single case, Your Honor.

3   And we've laid out everyone we can find to show that on a going

4   concern or even a market valuation here, sending the collateral

5   to India would only, would only increase their collateral base.

6   Instead they have repeatedly wanted us to dump inventory to pay

7   them off sooner rather than later even though we own all the

8   inventory, so when we sell it, the Debtor, while it may have

9   losses on the books, has an excellent cash flow because

10  everything -- because when it sells its inventory it doesn't

11  replace it.  The cash goes right to the bottom line and it's

12  been able, doing the whole time when they were negotiating with

13  these Lenders, paid down 13 million dollars worth of principal

14  in the last year, plus serviced interest, which is indicative if

15  they want to get into prior history of just how this Debtor's

16  operations have gone.  And is also indicative, Your Honor, of

17  the claims that somehow this company is being run, not for the

18  benefit of these Lenders, but for the benefit of other

19  affiliates of the Debtor.  And I understand that's always a

20  tricky issue.

21          But you know the issue is and I said in the papers and

22  I mean it, CRO's are a popular way of doing it.  And lots of

23  times people agree to it and we'll talk about the issue, but the

24  reality is this is a sub-rosa motion for an operating trustee

25  without attempting to meet the standards.  And every allegation

1    that they make has to do with pre-petition behavior.  There

2    isn't a single allegation in there about anything that this

3    Debtor has done post petition that would meet that very, very

4    high standard for an operating trustee.

5              THE COURT:  Let me --

6              MR. ROSEN:  Yes.

7              THE COURT:  -- break-in at this juncture because I

8    don't think this is a good time to have an argument about

9    whether or not there is or is not cause for a trustee since

10   there's no trustee motion.  But it is a good time for me to ask

11   you this question, I think.

12             MR. ROSEN:  Sure.

13             THE COURT:  It's apparent to me and it has been

14   apparent since March when this case filed that there is a

15   relationship problem between this Debtor and its Lenders.  And

16   notwithstanding the fact that the parties have been able to work

17   constructively and developed consensual collateral orders up to

18   this point, at least as of this morning times up.

19             One of the points that has been clearly communicated

20   to me is that the lenders for whatever reason lack confidence in

21   the current management of your Debtor, and are pleading, if you

22   read between the lines in their papers, for an outsider to be

23   parachuted in to provide them with a heightened level of

24   confidence concerning the management of this business.

25             I'm not going to substitute my business judgment for

1   that of anybody else, but I'd like to know why there's

2   resistance to bringing in an outsider that would undoubtedly

3   improve the relationship between this borrower and its lenders?

4           MR. ROSEN:  Fair question, Your Honor.  I think part

5   of it comes from the absolute -- it is a function of that

6   hostility that has gone on because from the Debtor's point of

7   view, the lenders have been attempting improperly to micromanage

8   this Debtor for over a year.  They have attempted to make

9   decisions and forced them to make decisions that from the

10  owners' point of view, and you have to understand that the

11  president of the Debtor has been in this business for 40 or 45

12  years, is a death nail for this company in terms of dumping its

13  inventory because that's all -- that's mainly what they wanted

14  them to do.  They wanted them to just to shed their inventory

15  and get them out.  They felt that the long term -- that they had

16  no long term interest.  And you can read that between the lines

17  in the papers also, is to get them out as soon as possible no

18  matter what the repercussions were for this company.

19          We did offer and I did put in the modified order to

20  put a CEO in place because our CEO did leave, all right.  To put

21  a CEO in place.  We picked a time period not that far out.  We

22  had tentatively agreed on 30 days.  I think I put 45 days in the

23  order to give us the time.  They had originally wanted it done

24  in 15 days which means we could only take whoever they had in

25  their back pocket because we wouldn't have time to do anything

1  about it.  To put somebody in and to give them -- to do it

2  subject to their approval.  So, in part and terms of the Debtor,

3  it's been the Debtor's belief that it knows what's best for it's

4  company, that they made strategic decisions that were -- while

5  we're in Chapter 11, the strategic decisions that they made put

6  them well about the curve.  They made the decision to get out of

7  selling to the majors because they realized it was not

8  profitable, and that carrying everything was going to kill them.

9  That's what killed Fabricant.  Fabricant didn't get out, and

10 they got put under because of it.  And in that positions the

11 creditors are taking I think -- they're claims are trading at 35

12 or 36 cents on the dollar now.

13      They took the position in terms of the management.  I

14 think there is a huge amount of distrust on both sides, Your

15 Honor.  I tried to mediate it and co-counsel tried to mediate it

16 by coming up with the approval over the CEO because there are

17 more world wide ramifications.  There's also a great deal of

18 suspicion, Your Honor, as I alleged in the papers because this

19 isn't a simple case, as I said.

20      The fact of the matter is Bank Leumi is the primary

21 Lender through its affiliate in Israel.  ABN is the lender to

22 the India.  These are a complicated set of relationships and the

23 Debtor would believe one way or the other and the Debtor has

24 been outright threatened on worldwide problems if it didn't do

25 things here that this was an attempt through the Lenders to try

1   and take over.

2          I hear your concern.  I know you're not prejudging

3   anything.  I hear the issue that's been there, Your Honor.  And

4   the other issue that's gone on here has kind of been an issue of

5   greedy and greedier.  I've been presented throughout this case

6   with a series of issues that were the most important, okay.

7   First I was told the most important issue to the lender was that

8   we dump inventory, all right.  I went back and despite

9   everything the Lender said, I got a concession out of my client

10  that if we didn't hit certain numbers to be able on confirmation

11  which we planned to come out in March, to give them six and half

12  million, six to six and a half million dollars in principal paid

13  down that we would dump inventory to get there.  And you'll see

14  in the proposed order that we put in, language we came up that

15  if we hadn't hit that graduated number by October, we would

16  start selling.  We came up with caps.  So, I was told that that

17  was the biggest thing they wanted.  I delivered it; all right.

18         Then I got told the biggest thing was something else.

19  Then finally I get hit right before when we're done with a whole

20  bunch of other issues now with the CRO issue.  This issue has

21  not been on the table the whole time.  And it comes to the table

22  after we let them look at absolutely everything.  And their main

23  complaint seems to be that the CFO takes direction from the

24  President of the company.

25         I tried to show you, Your Honor, that there haven't

1   been any decisions that have been made here by any of the other

2   affiliates.  And I'm very aware of my responsibility as an

3   attorney; my fiduciary responsibilities as an attorney to the

4   Debtor that have benefited the affiliates over Debtor.  It's

5   mostly been flowing the other way.  The plane was paid for from

6   Israel because that's a liability of the Debtor.  That creditor

7   is not going to go after Israel.  You've now been given proof

8   which I didn't even know before I saw those papers that

9   guarantee -- that unsecured guarantee against LID Israel

10  probably isn't worth anything.  So, if the plane does not get

11  sold at a profit, that's going to be a claim against this Debtor

12  and we propose that this is going to eventually be a 100 percent

13  plan.  You know we may have a resolution in terms of claims

14  against Lenders that doesn't get us there.  But in terms of

15  unsecured creditors based on the position we're taking we have

16  to propose that.  I don't want to get too far afield, Your

17  Honor.

18       But I want to give you an idea of where my -- what my

19  client's mindset is.  We will talk about it, I will listen to

20  you but that's where the mindset I think has been in terms of

21  the fact that if I do this, what's next because it's always been

22  something more.  And there is a great degree of -- I have to

23  just use the word anger over the fact that the Lenders are

24  saying you know the Collateral is not up the par and a lot of it

25  can only be sold as scrap when we've been trying to

1  remanufacture it for over a year and if we had been able to send

2  the 10 million dollars out or the 20 million dollars out because

3  through economies of scale in terms of when you're breaking down

4  jewelry you don't send 10 million dollars of jewelry out and get

5  back 10 million dollars.  You take it apart; you sort the

6  stones.  Sometimes you need the next batch to do it.  So, for it

7  to work through those economies that we wouldn't be sitting with

8  five percent of our inventory, but we'd be sitting with 50

9  percent of our inventory saleable, ready to put out on

10  consignment and we would be making a lot of money instead of

11  having problems because we don't have the saleable inventory

12  that we need.  So, that's part of where the gap is.

13      And part of the gap is also Your Honor is while you

14  had a unified response there, the Lenders to a degree have been

15  playing tag team.  Whether it's good guy, bad guy, you know as I

16  said there's no agency agreement here.  They all get -- so

17  they're not bound to one another, sometimes they give us a

18  united front, sometimes they don't, sometimes two go along with

19  something, three, one, they change their minds.  So, it is a

20  very, very difficult situation to negotiate.

21      I understand the benefits because I think you were

22  going to say that to me of a CRO in that circumstance because

23  it's kind of as one of the Lenders said; you know be careful

24  what you ask for in terms of when you ask for something like

25  that because you can't necessarily complain, but that's the gulf

1   that I have to bridge.  I don't know if I've answered your

2   question.

3          THE COURT:  Well, you've answered my question and said

4   a lot of other things too.

5          MR. ROSEN:  I usually do, Your Honor.

6          THE COURT:  Are you mostly done with your opening

7   remark or is there more you wish to convey at this point?

8          MR. ROSEN:  Your Honor, I think -- we spent the vast

9   majority of the weekend trying to put all of our issues before

10  you that are there.  And I know you read everything so in terms

11  of my opening remarks, no, I think -- I understand that the

12  Lenders have a lot of say in this case.  It's not impossible.

13  We have made a lot of progress.  We did propose already -- give

14  them the backup to a certain degree for a plan proposal.  I know

15  they scream a lot about not having gotten a formal business

16  plan.  It's very hard to do that without being able to actually

17  know how much of our inventory we're going to be able to

18  remanufacture and what we're going to do.  So, in terms of the

19  cash collateral you've got a lot paper before you.  The issues

20  come down and maybe there is a common ground.  The issues come

21  down to the Debtor wants to be able to run it's business in the

22  normal course and you know the Lenders want to have some

23  adequate assurance of their collateral.

24          At the end of the day, even if the most conservative

25  numbers that we have here, if the Lenders are looking at a ten

1   to twenty million dollar equity cushion which is what we think

2   they are, and plus they're receiving their interest.  You know

3   the real issue becomes how much control do they get to exert?

4   How much do they get to operate the Debtor when there are other

5   unsecured creditors because we went through a lot of trouble to

6   try and go through all of their reports and analyze it and

7   compare it.  And I think that that's what the number is at the

8   very, very least.  And of course if you use an enterprise value

9   or going concern value the number is much, much higher.  So,

10  I'll give other people a chance to speak now.  I think you

11  understand our position.  And I thank you.

12          THE COURT:  Okay.  Am I to hear from one on behalf of

13  four or four on behalf of four?

14          MR. ATAMIAN:  We'll try to do it one on behalf of four

15  as much as possible.  But on certain issues other Lenders may

16  want to be heard.

17          THE COURT:  Okay fine; why don't you come to the

18  podium.

19          MR. ATAMIAN:  Good morning, Your Honor, Jean-Marie

20  Atamian from Mayer Brown, Row & Maw on behalf of ABN AMRO.  And

21  I'm here with my colleague Craig Reimer, Laura Metzger and

22  Raniero D'Aversa; somewhat a peanut gallery.

23          Your Honor, has hit this on the head.  We simply don't

24  have any confidence in this management and it's not because

25  we're unduly suspicious people, because we have a track record

1   here.  We have a three-year track record of losses.  We have a

2   CFO here who is young and relatively inexperienced.  This isn't

3   personal, Your Honor, it's just business.  The Debtor's

4   financial condition has spun out of control on his watch.  From

5   2004 to today, sales have gone down from 130 million to at best,

6   at best, 20 or 25 million using the Debtor's most optimistic

7   numbers.  In fact they submitted a 25 million dollar projection

8   to you a few months ago.  Recently they've told us that they'll

9   be lucky to hit 18 million dollars, Your Honor.  That is a

10  tremendous deterioration in the short time this case has been

11  pending -- in the relatively short time this case has been

12  pending.

13          So, whether they propose to remedy this situation,

14  well, they're going to have a CFO of an affiliate company who's

15  sitting in Israel help this company.  We just don't think that's

16  going to work, Your Honor.  Worst yet, the CEO that they had

17  just resigned.  He didn't stay seven months because the

18  situation was so chaotic.  They tied his hands; they wouldn't

19  let him do his job.  They prevented him from going to key

20  meetings with the lenders.  They disinvited him at the last

21  minute when we were supposed to have a meeting with the Debtor

22  that had been planned for several weeks.

23          Again, how does the Debtor want to remedy this

24  situation?  Well, they want to have somebody else who's sitting

25  in Israel help this Debtor and try to remedy this enormous void

1    that's been left.  They really have no management in place in

2    New York worthy of that name.  The CFO has testified that all of

3    the major decisions are made by David Elishayov.  Again David

4    Elishayov resides in Israel. This is simply no way to run any

5    company, Your Honor.  And it's certainly not a way to try to

6    salvage a company which is hemorrhaging.  Losses have been going

7    through the floor for years.  Sales have been going through the

8    floor for years; I apologize.  The only thing that's been going

9    up here are the losses.

10           The financials that I submitted for June alone show

11   losses of $633,000 for that month.  Their own projections show

12   that they anticipate many additional consecutive months of

13   losses this year.  So, there is an absolute desperate need for

14   an independent third party here to run this company.  And we

15   think that the CRO -- a CRO is probably the best way to go.  We

16   need to salvage inventory.  We need to salvage the situation

17   while there's still something worth salvaging.  This is just a

18   train wreck waiting to happen.

19           Again, the situation has been festering for three

20   years.  It seems to me the Lenders have shown a fair amount of

21   patience here.  The Debtor claims that it's got something like

22   80 million dollars of inventory to secure forty something

23   million dollars worth of loans.  That's just pure fiction, Your

24   Honor.  The valuation that was done after two, two and half

25   months of effort by Mr. Bucks who's in the courtroom today,

1   shows that a valuation came in at 49 million dollars.  That

2   number doesn't give the Lenders much comfort for a variety of

3   reasons.  That is the cost of replacing that inventory if the

4   Debtor were to go out and purchase it or try to purchase it

5   today.  That is not the price that that inventory would fetch on

6   the open market if this inventory were sold within a relatively

7   shorter acceptable period of time.

8           The inventory is extremely low quality.  The

9   liquidation value based on two and half months of work shows

10  that it might sell for 19 million dollars to 21 million dollars.

11  And that's if you factor in all of the goods that have been on

12  consignment and many of those goods have been on consignment for

13  one to three years.  Those goods are not moving.

14          In addition there are millions and millions of dollars

15  of these diamonds that are sitting in sealed crates at the

16  Debtors in bulk parcel inventories that we refer to in our

17  papers.  In addition you've got millions and millions of dollars

18  of diamonds that are just sitting in the vaults.  It is just not

19  moving.  So, that this notion that if they could send million of

20  dollars of inventory to India, much of it for a second and

21  probably a third time, to make it more saleable, we think is

22  just a fiction to get inventory out of the United States and

23  away from the Lenders.  Again they are burning through cash as

24  we speak.  There's really no reason prospect that this is a

25  going concern the way it's being currently run, Your Honor.

1      There are some counting issues that have caused us a

2  fair amount of trouble also.  Management has misrepresented its

3  financial condition on an ongoing basis.  They've grossly

4  inflated the value of inventory and the borrowing base

5  certificates that they submit on a monthly basis to the Lenders.

6  As Your Honor knows those borrowing base certificates are

7  certifications by management of the Debtor that they have

8  certain amount of availability that they can borrow a certain

9  amount based on accounts receivable and inventory. Virtually,

10  the totality of what they're borrowing here is against

11  inventory; there's very little accounts receivable that are less

12  than 90 days out, and we noticed huge discrepancies between the

13  inventory that they list in the borrowing base certificates and

14  in the financial statements which are also documents which Your

15  Honor they prepare.

16      In one period, the discrepancy was 14 million dollars.

17  In other words, they were inflating inventory by 14 million

18  dollars in the borrowing base certificate.  That is a huge

19  discrepancy given the amount of collateral involved here, Your

20  Honor.  One of the other accounting gimmickries, if you will,

21  that we've discovered is that they are inflating inventory by

22  applying arbitrary increases, across the board increases, to

23  that inventory.  Typically these are increases of 10 to 15

24  percent.  It appears that it hasn't always been applied to all

25  the inventories, but at least it's been applied to substantial

1    portions of that inventory.

2         Again, that is done for the sole purpose of bulking up

3    the inventory.  And who makes that decision, Your Honor?  It's

4    not the CFO, it's not someone in the United States who's in

5    there with the inventory on a daily basis.  It's David Elishayov

6    who, again, is in Israel.  And really is not in the offices on a

7    daily basis.  The CFO has conceded that he has increased

8    inventory values across the board by 10 to 15 percent at the

9    direction of Mr. Elishayov.  He has said that he doesn't know

10   why David Elishayov directs him to do these things.  He doesn't

11   ask him really what the basis for doing it is, he just does it.

12   He's following orders.  We don't think that's enough for the CFO

13   of this company.  We think the CFO has an obligation to do a lot

14   more than to just follow orders.

15        To add insult to injury, Your Honor, they've also

16   inflated inventory by valuing inventory across the board at

17   current cost instead average cost.  That is not GAP compliant

18   and it is again another way by which they made this inventory

19   appear a lot more valuable than it actually is.  And Your Honor

20   the inventory is really the only asset that this Debtor has.

21   There's really little else to give the banks any comfort.  So,

22   as this inventory evaporates and is inflated in value, what

23   remains as inflated in value the Lenders push and pretty much

24   disappears, assuming there's any pushing today.  And we don't

25   really believe that there is.

1          One of the more distressing things is something that

2    we have referred to as the round-tripping of inventory.  These

3    are the bulk parcels that frankly should have frequent flyer

4    miles.  They are moved from one affiliate to another as that

5    affiliate needs the goods for various purposes.  I can't speak

6    to what purposes the affiliates outside the U.S. use this bulk

7    inventory for, but in the U.S. they've brought in 7 to 9 of

8    these large consignments of these large bulk parcels in the last

9    year or so, again, because they needed it to bulk up inventory.

10   Many of these parcels hadn't even been opened.

11         They're sitting there on the floor in the vault.

12   We're talking about boxes of diamonds that have several thousand

13   diamonds and some of them may have values in excess of a million

14   dollars.  They really serve no legitimate business purpose, and

15   none have been proffered to us.  In fact, we were told that

16   they're there to please the banks.

17         One of the other things that our appraisal has shown

18   is that the value of two of those bulk parcels in particular

19   have grossly overstated values.

20         THE COURT:  Just for clarity, when you say that your

21   appraisal has shown.  There are a number of appraisals that have

22   been performed by different individuals.  I just want to make

23   sure we're talking something that I can trace to a document that

24   I have.

25         MR. ATAMIAN:  The David Bucks appraisal.  The one that

1   was submitted with the papers to the Court.

2           THE COURT:  All right.

3           MR. ATAMIAN:  We're referring to purchase order number

4   367 and 368.  The appraisal shows that those two containers only

5   have about 2 million dollars of diamonds of diamonds.  The

6   Debtor's papers show they've reflected a 5 million dollar value.

7   So, that's yet another major issue of concern for the banks.

8           Frankly, you know this globetrotting inventory, Your

9   Honor, has further undermined our convince in what this

10  inventory was worth and now with the David Bucks appraisal we

11  realize that there is not close to anywhere close to 80 million

12  dollars of inventory on premises.

13          And one of the additional distressing things is that

14  this Debtor wants to send millions of dollars of this collateral

15  out of the country once again.  And you heard Mr. Rosen talk

16  about them wanting to send millions of dollars of inventory

17  which has already been remanufactured to India to be

18  remanufactured once again as though that's going to make these

19  goods anymore saleable.

20          As Your Honor saw from our papers -- I don't want to

21  belabor the point -- many of these rings much of this amount of

22  jewelry, millions of dollars of these diamonds have been sitting

23  around in vaults for years.  Much of the jewelry has been out on

24  consignment for one year, for three years.  We're talking about

25  millions and millions of dollars which is beyond our grasp.  And

1   we place very little value in goods that haven't sold for three

2   years.

3        It seems to us based on everything we've heard from

4   the experts that anything that's been out on consignment for

5   over a year well you've got to be highly suspect as to what

6   you're really going to get for that inventory assuming that it's

7   eventually sold.

8        One of the things we've highlighted in our papers

9   also, Your Honor, is that there have been constant violations of

10  post-petition orders here.  On April 19 of this year after this

11  action was commenced, the Debtor transferred 2.4 million dollars

12  of its inventory over seas.  It's the Lender's position that

13  that's a default under the interim order.

14       One of the other violations of the orders has been

15  that the Debtor has been paying its affiliate very substantial

16  amounts to actually remanufacture the goods that are there.

17       THE COURT:  Is this the affiliate in India?

18       MR. ATAMIAN:  These are goods that have been

19  remanufactured.  There are the Debtor's goods in India that are

20  being remanufactured there because that's where the factory is.

21  They don't remanufacture goods in the United States.  It's a lot

22  cheaper to do it in India presumably.  There was a 10 percent

23  limit on what India could charge LID India could charge LID New

24  York for remanufacturing.  But we've seen invoices where the

25  remanufacturing costs or the making value, call it whatever you

1    will, far exceed 10 percent.  You see invoices where they're

2    charging 20-30 and beyond that percent to remanufacture goods.

3    That clearly is inappropriate, and it's a violation of the

4    orders here.

5            The Lenders have been seeking a business plan for

6    months.  The Debtor has been stalling.  We still don't have a

7    business plan.  We have probably asked for one on a half dozen

8    occasions.  I've been privy to all the conversations where this

9    has come up, but to this day, we don't have a business plan and

10   the Debtor has not committed to a date where we can expect to

11   see a business plan.  A few weeks ago we had a meeting set up

12   where we were supposed to have the CEO come, Lyle Rose, who has

13   since resigned, and tell us how this company plans to turn

14   things around.  That meeting, again at David Elishayov's

15   request, apparently, or direction was cancelled.  And it was

16   cancelled by the way, Your Honor, while some of the bank

17   representatives were in transit to attend the meeting.

18           So, whichever way you look at it, Your Honor, we don't

19   believe we have adequate protection here.  We don't believe we

20   have an adequate equity cushion.  The collateral has been

21   grossly inflated and overstated.  It is likely inadequate to

22   secure the amounts that we are currently owed.  We believe that

23   we have an absolutely vital need for a CRO.  We don't that will

24   resolve all the issues, but we think most of the other issues

25   will fall into place, if we have an independent objective third

1    party helping to manage this company.

2              By the way, Your Honor, the Lenders are the only real

3    creditors here.  There is no creditors' committee for the Court

4    to be concerned about, and we don't believe that there will be a

5    creditors committee in this action.

6              THE COURT:  Well, just because there isn't a

7    creditors' committee, doesn't mean that there aren't other

8    creditors.

9              MR. ATAMIAN:  Understand --

10             THE COURT:  They're simply not represented by a

11   committee at this point.

12             MR. ATAMIAN:  Understood, Your Honor.

13             THE COURT:  Is there anyone else who wishes to be

14   heard on behalf of the Lenders to supplement what has just been

15   said?

16             MR. ATAMIAN:  Thank you, Your Honor.

17             MR. LEVINE:  Good morning, Your Honor, Scott K. Levine

18   of Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow.  We're

19   counsel to HSBC.  Your Honor, I'll be very brief in my

20   supplement.  But basically the Debtor has contended that they'd

21   like Court to look at the going concern value of the collateral.

22   And in doing so, they've almost conceded the fact -- and if you

23   look at the liquidation value, the Lenders would not be

24   adequately protected.

25             And if this Court is going to consider the going

1    concern value of the collateral to adequately protect the

2    Lenders in doing so the Court has to find that there is a going

3    concern; has to look at the viability of this Debtor.  And it

4    throws into question all of the aspects that go into the

5    viability of a company including its track record, including its

6    business plan, including its management, including its sales,

7    including whether its having a profit or a loss and of course

8    including whether its complying with the bankruptcy code and the

9    orders of this Court.

10          And it's very important, Your Honor, because if we are

11   going to look at the going concern value, there has to be an

12   adequate protection comfort level that this company, that this

13   Debtor will survive.  And that is where the Debtor and the

14   Lenders differ.

15          With the present management in place, there is no

16   comfort level, Your Honor.  And that is why although there's not

17   a motion for a CRO in determining whether or not this Debtor

18   should be entitled to use cash collateral that can be addressed

19   by the Court because if the Court finds that the management is

20   incapable, it should not grant the Debtor's motion for use of

21   cash collateral.  And then there will be no issue on the CRO at

22   least until we bring a separate motion.

23          Your Honor, if you look at the various aspects I've

24   mentioned, the Debtor has not come forward with any business

25   plan.  We've asked for it numerous times as counsel indicated.

1    Nothing has come to us.  There is no written document despite

2    numerous requests.  The Debtor's sales have plummeted.  They've

3    gone from over a 100 million in 2004 to first the Debtor said it

4    was going to 25 million; then the Debtor said it was going to be

5    20 million; now they've said it's going to be 18 million.

6           If you look at the Debtor's operating reports, the

7    sales have actually been only about 3 million during this

8    proceeding.  And if you annualize that because it's been about

9    four months, it would only be about a 12 million dollar annual

10   sales level.  So, the Debtor's sales are very much in question.

11   But more importantly a company can only survive if it's

12   profitable.  This Debtor has not had a single month of

13   profitability during the proceeding.  Its operating reports did

14   not even reflect profitability until it was brought up to the

15   Debtor that they're not in compliance.  They finally filed their

16   June Operating Report which indicates that there have been

17   losses in June of over 600,000 and a loss every preceding month

18   during this Chapter 11 for a total of over 2 million dollars in

19   losses.  A Debtor is not going to survive if it cannot be

20   profitable.  The idea that it will just liquidate its inventory

21   to pay off the Lenders does not lead to a viable company that

22   can ultimate propose a feasible plan of reorganization and we

23   think that's very, very important.

24          And finally, Your Honor, if you look at the Debtor's

25   ability to remain in Chapter, it has to have the ability to

1    comply with the bankruptcy code and the orders of this Court.

2    They did not file proper and adequate operating reports until

3    just recently.  They have not complied with the first cash

4    collateral order because they sent goods to India which was

5    contrary to that first order.  They did not comply with the

6    second cash collateral order which said that they could not

7    subordinate debt to insider companies which they in fact did

8    after the fact.

9        The problem here, Your Honor, is they do what they

10   want and it's a catch me if you can, and we've caught them, Your

11   Honor, time and again, and then they make changes to try to come

12   into compliance, but that raises the very issue of viability.

13   And if this Court finds that this company is not viable, then I

14   don't believe a going concern value is appropriate.  The Debtors

15   will not be able to provide the Lenders with adequate protection

16   and as a consequence, the Debtor's motion must be denied.  And

17   we thank you.  We will proffer evidence throughout this

18   proceeding to indicate what I have said.

19        THE COURT:  Okay.

20        MR. LEVINE:  Thank you.

21        THE COURT:  Is that -- is that everything that the

22   Lenders have to say at least as a preliminary?  Apparently, not.

23        MR. FLYNN:  Your Honor, just not to beat a dead horse,

24   David Flynn for Sovereign Bank.  I did want to affirmatively

25   stand and support previous statements, not just repeat them.

1    This is a Debtor with a business in trouble; they need

2    independent, third party, with authority in there to help try to

3    turn it around.  I have severe doubts whether that's possible,

4    but this is absolutely necessary that someone be installed to

5    help out.  Thank you.

6              THE COURT:  Okay.  It's just too tempting to get up

7    and speak, isn't it?

8              MR. SCHMIDT:  Just very briefly, Your Honor; my two

9    cents.  Frederick Schmidt of Herrick Feinstein, counsel for Bank

10   Leumi.  I just want to point out to the Court and reinforce our

11   view that the burden of -- the Debtor has really not met its

12   burden of proof and it's the Debtor's burden to establish that

13   the Lenders are adequately protected; and for all of the reasons

14   that all of counsel have spoken to so far, the Debtor just

15   cannot meet that burden.  That's all I have.

16             THE COURT:  Okay.

17             MR. ROSEN:  Four people have gotten up so I guess I --

18   I think I'm safe.  May I respond?

19             THE COURT:  You can certainly respond if wish,

20   although I have a few reactions to share with everybody.  I

21   don't know that it's critically important that you say anything

22   more, but I'll give you the opportunity to speak, Mr. Rosen

23   after I have my remarks.

24             A couple of preliminary observations; Mr. Rosen

25   indicated earlier that he thought there could be some value in

1  conversations with Lenders' counsel before we get into the

2  substance of this contested hearing, and I haven't heard anybody

3  on the Lenders' side say that that would be a waste of time so

4  I'm going to treat that as a hint that it would be worthwhile to

5  have a conversation.

6          It is obvious to me that the use of collateral is of

7  critical importance both to the Debtor and to the Lenders and

8  that it's important regardless of the strength of the business;

9  that the business be permitted to continue to function.  And

10  it's best that that be done by agreement as opposed to the

11  somewhat public and necessarily expensive process of litigating

12  issues of use of cash collateral.  Particularly where there are

13  disagreements as to the fair value of the underlying inventory.

14          Lenders are almost always in a difficult position at

15  times like this because they end up making statements inevitable

16  against their interest, if as in when the hearing is over, the

17  business has been stabilized to some extent and they've

18  endeavoring to maximize the value of their collateral.  So, that

19  at times like this it's always better not to show all cards

20  publicly.

21          I think it would be useful to have the parties talk

22  for awhile.  We have a conference room available although it's

23  not big enough to seat everybody who's in the room, and to

24  explore whether or not it's possible to work out some kind of

25  consent to the use of cash collateral, either long term or short

1   term.  Long term would be better.  I believe based upon what

2   I've heard and what I've read that there are three fundamental

3   issues that are embedded in the present motion for use of cash

4   collateral.

5          One is value.  And that goes to the question of what

6   the diamond inventory is worth and the proper method for valuing

7   it whether that should be liquidation value or going concern

8   value.  And there are issues as to the four "C's, which I read

9   about in the Wall Street Journal; carat, cut, clarity, color.

10  All of which goes to the essential value of this kind of

11  inventory.

12         The second major issue is trust.  There doesn't seem

13  to be any.  And when there is no trust in management and

14  management doesn't trust the Lenders.  It's very difficult to

15  work out a consensual arrangement in the absence of trust,

16  especially when it's absence on both sides.

17         The third embedded issue in my view is operations.

18  There is a theme in the Lenders' presentation of doubt and

19  suspicion.  Doubt with the business as being adequately managed.

20  And suspicion concerning the Israeli and Indian operations and

21  affiliates.  Were it not for the suspicion, it's my supposition

22  at least, that there would be less concern about having valuable

23  inventory shipped over seas.

24         These three actors that I perceive and because I

25  perceive them you should all know that I perceive them because

1   it should inform your negotiations and your trial preparations,

2   impact the request by the Lenders though they're not part of a

3   formal motion for a chief restructuring officer.  I deem that

4   request as not being something that needs to be made by separate

5   motion, but instead I do it as an indication that the Lenders

6   will require that in order for their consent to the use of cash

7   collateral and we'll consider that to be a component of their

8   adequate protection.  I'm not now deciding because there's no

9   evidence, just argument, that a chief restructuring officer is

10  in fact a requirement for my ultimate finding that the Lenders

11  are adequately protected, but I believe that it's the subject

12  that should be openly addressed by the Debtor if not embraced by

13  the Debtor.

14          There was a proposal to settle this matter that I

15  apparently should not have seen which is Exhibit 14 in a two-

16  volume set that was delivered to me yesterday by Debtor's

17  counsel.  It's an email dated July 27 addressed I think to all

18  of the Lenders' counsel, in which -- at least as of a few days

19  ago the Debtor was responding to various proposals relating to a

20  consensual use of cash collateral.  I do not know whether or not

21  that is a useful agenda with the meeting I propose you now have.

22  It may be that events have moved beyond Exhibit 14.

23          But I do believe it would be useful for the parties to

24  confer with one another to either (1) explore the prospects for

25  consent to use cash collateral that will avoid a contested

1    hearing.  And (2) to the extent that number (1) is to be

2    impossible, and I hope that's not the case, that you can at

3    least attempt to streamline issues of proof relating to the

4    contested hearing itself.

5            There's a report that I read yesterday that was filed

6    by Mr. Rosen undoubtedly he spend the better part of the weekend

7    dealing with that submission, and a lot of it had to do with the

8    credibility of what was approved from Lenders.  There are

9    requests that I limit; he testimony of certain witnesses.  I

10   have in the past in other cases ruled on Dalbert markings.  This

11   one is a little different in that it's as much as anything an

12   attack on the expert report as not in some instances satisfying

13   the requirements of the federal rules relating to expert

14   reports.

15           In the context of an expert related and critical

16   hearing such as this I am going to be very liberal in my

17   approaches to evidentiary rulings.  I consider it to be

18   important that as a finder of fact I'd be fully informed

19   concerning the use of third parties who spend time examining the

20   collateral and making judgments concerning the value of that

21   collateral.  For that reason it is more likely than not, and I'm

22   not ruling on the Dalbert-type motions now, that I'm going to

23   hear the evidence offered by the Lenders and will consider the

24   Debtors not prejudice because they will have the ability to

25   cross examine and to argue that the evidence should be given a

1    little a weight.  For that reason while I'm prepared to hear and

2    decide motions in limine that have been proposed by the Debtors,

3    I think we should spend very little time on that.

4         Those are my preliminary remarks which you can think

5    about as you talk to each other.  The first thing I'd like to do

6    is confirm that I'm correct that the Lenders are prepared to

7    talk.

8         MR. ATAMIAN:  Yes, we are, Your Honor.

9         THE COURT:  Fine.  My suggestion then is that you

10   identify those individuals who can comfortably fit in the

11   conference room across from my chambers and we'll open up that

12   room.  So, I guess now it's 11:22.  My suggestion is that some

13   representative or group knock on my chambers door at about 12:30

14   to simply provide a status report as to how you're doing and

15   whether or not you're going to need more time to talk or whether

16   or not we should be prepared to start the hearing at two o'clock

17   this afternoon.

18        I'm not saying that you only have an hour and eight

19   minutes to try to reach an agreement, but I'm giving you what

20   amounts to a window for you to determine that you're making

21   significant progress and it's worth continuing to talk or you're

22   not, in which case we're going to move into battle gear for two

23   o'clock.  I'll wait to hear the knock on my chambers' door at

24   12:30 and my courtroom deputy will provide with the room.  We're

25   adjourned 'til then.

CERTIFICATION


     I, Rochelle Grant, certify that the foregoing is a correct

transcript from the official electronic sound recording of the

proceedings in the above-entitled matter.


Dated:  January 19, 2008.




_____

Signature of Approved Transcriber